RECEIVED
IN MONROE, LA

MAY 2 2 2007

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA

**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF LOUISIANA**

**MONROE DIVISION**

**ROBERT WEAVER**

**VERSUS**

**CCA INDUSTRIES, INC.**

**CIVIL ACTION NO.: 01-2096**

**JUDGE ROBERT G. JAMES**

**MAG.  JUDGE KAREN L. HAYES**

## RULING

Pending before the Court is a Motion for Summary Judgment [Doc. No. 41] filed by Third

Party Defendant New York Marine and General Insurance Company ("NYMAGIC").  NYMAGIC

contends that Third Party Plaintiff CCA Industries, Inc. ("CCA") is not entitled to coverage under

a policy of insurance issued to Phoenix Laboratories, Inc. ("Phoenix").

For the following reasons, NYMAGIC's Motion for Summary Judgment is GRANTED, and

CCA's third–party claims against NYMAGIC are DISMISSED WITH PREJUDICE.

**I.     FACTS**

Plaintiff Robert Weaver ("Weaver") brought this lawsuit on the basis of injuries he

allegedly sustained from ingesting "Permathene," a product formulated, labeled, marketed, and

sold by CCA.

In 1995, Weaver began taking Permathene, an over-the-counter diet drug/appetite

suppressant which contains phenylpropanolamine ("PPA").  Eleven days after he began taking

Permathene, on or about August 24, 1995, Weaver suffered a hemorrhagic stroke.  Weaver

contends that the PPA in Permathene caused his stroke.

On October 12, 2001, Weaver filed suit against CCA, alleging that it "manufactured,

promoted and marketed products containing PPA directly to consumers by making representations regarding the safety of their products and misrepresentation or omissions regarding the risks of their products." [Doc. No. 1, ¶ 3]. Weaver further alleges that CCA "failed to properly advise consumers of the known risks of PPA," including hemorrhagic stroke. [Doc. No. 1, ¶¶ 2-3]. Weaver has asserted products liability claims against CCA, contending that Permathene was unreasonably dangerous because of its defective manufacture, its defective design, CCA's failure to provide an adequate warning about the risks associated with Permathene, CCA's failure to adequately and properly test Permathene, and the failure of Permathene to conform to the express warranty issued by CCA. [Doc. No. 1, ¶¶ 17, 26].

Although Permathene is sold and marketed by CCA, it is manufactured by Phoenix Laboratories, Inc. ("Phoenix"). CCA provided a formula to Phoenix, which then assembled the component Permathene ingredients in its factory and then shipped the products in bulk to CCA to be packaged and labeled.[1]  CCA marketed Permathene for sale to the general public at retail outlets. Weaver has not alleged that CCA and Phoenix conspired to manufacture Permathene defectively or raised any other claim against Phoenix directly.

On March 11, 2002, June 20, 2002, and April 10, 2006, CCA made demands on Phoenix's insurer, NYMAGIC, for defense and indemnification of any damages it might have to

---

[1]Although CCA indicates in its arguments that Phoenix may also have sent the product to another entity besides CCA for packaging and labeling, CCA admitted in answers to requests for admissions that it "received the product from Phoenix in bulk (meaning the product was not packaged for sale to the general public)" and that CCA "packaged and labeled the product for sale to the general public." [Doc. No. 42, Exh. D, Responses to Requests for Admissions Nos. 1 & 2]. CCA has not indicated that Phoenix was ever responsible for labeling Permathene.

pay to Weaver.[2] NYMAGIC declined coverage on July 26, 2002, and again on May 17, 2006.

On June 15, 2006,[3] with leave of Court, CCA filed a third-party complaint against Phoenix and against NYMAGIC[4] for defense and indemnification.  CCA asserts that Phoenix obtained claims made liability insurance from NYMAGIC for CCA products.  CCA asserts that the NYMAGIC policy, under its vendor's endorsement, afforded liability coverage to CCA; the policy was in full force and effect on the date of Weaver's stroke; and CCA timely made a claim under the policy.   In support of its assertions, CCA points to its receipt of Certificates of Liability Insurance every year from 1990 through 1998, which indicated that it was an additional insured vendor under Phoenix's policy with NYMAGIC.

On April 11, 2007, NYMAGIC filed the instant Motion for Summary Judgment [Doc. No. 41]. NYMAGIC denies that CCA is covered under the policy issued to Phoenix since CCA was not a named insured under the policy.  NYMAGIC further contends that CCA was excluded from coverage under the policy's vendor's endorsement because CCA provided the formula  Phoenix used to manufacture Permathene, CCA labeled or re-labeled Permathene for sale to the public, and CCA extended an express warranty to the public without Phoenix's permission.

On April 24, 2007, CCA filed a memorandum in opposition [Doc. No. 46] to

---

[2]It is undisputed that there is no written indemnification agreement between the parties. The only issue is whether CCA is an additional insured under the vendor's endorsement to Phoenix's policy of insurance with NYMAGIC.

[3]Pursuant to 28 U.S.C. § 1407, this matter was transferred to the Judicial Panel on Multi-District Litigation, MDL No. 1407, In re Phenylpropanolamine (PPA) Products Liability Litigation, and assigned to the United States District Court, Western District of Washington at Seattle, where discovery was conducted.  The case was remanded to this Court on March 27, 2006. See [Doc. No. 18].

[4]CCA named Mutual Marine Office, Inc. as the insurer of Phoenix, but the actual insurer is NYMAGIC. See [Doc. No. 31].

3

NYMAGIC's Motion for Summary Judgment.

On May 7, 2007, with leave of Court, NYMAGIC filed a reply memorandum [Doc. No. 50].

## II.     LAW AND ANALYSIS

### A.     Motions for Summary Judgment

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. Topalian v. Ehrmann, 954 F.2d 1125, 1132 (5th Cir. 1992). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under the applicable law in the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. Id. The moving party cannot satisfy its initial burden simply by setting forth conclusory statements that the nonmoving party has no evidence to prove its case. Ashe v. Corley, 992 F.2d 540, 543 (5th Cir. 1993).

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. Norman v. Apache Corp., 19 F.3d 1017, 1023 (5th Cir. 1994). "The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which the evidence supports his or her claim." Ragas v. Tenn. Gas Pipeline Co., 136 F.3d 455, 458 (5th

Cir. 1998). The nonmoving party must show more than "some metaphysical doubt as to the

material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586

(1986). In evaluating the evidence tendered by the parties, the court must accept the evidence of

the nonmovant as credible and draw all justifiable inferences in its favor. Anderson, 477 U.S. at

255.

## B.    Is CCA an additional insured under the NYMAGIC policy?

In this diversity case, the parties agree that the policy in question should be interpreted

under Louisiana law. The Fifth Circuit has explained the general rule for interpreting insurance

contracts as follows:

> A Louisiana insurance contract is interpreted according to general
> contract principles. Louisiana law provides that the parties' intent,
> as reflected by the words of the policy, determines the extent of
> coverage. Such intent is to be determined in accordance with the
> plain, ordinary, and popular sense of the language used in the
> policy, unless the words have acquired a technical meaning. . . .
> An insurance contract should not be given an interpretation which
> would lead to an absurd conclusion. If the language in an
> insurance contract is clear and unambiguous, the agreement must
> be enforced as written. In such a case, the meaning and intent of
> the parties to the written contract must be sought within the four
> corners of the instrument and cannot be explained or contradicted
> by parol evidence. . . . [T]he use of extrinsic evidence is proper
> only where a contract is ambiguous after an examination of the
> four corners of the instrument.

Edwards v. Your Credit, Inc., 148 F.3d 427, 444 (5th Cir. 1998) (citations omitted); see also

Cadwallader v. Allstate Ins. Co., 848 So.2d 577, 580 (La. 2003).

NYMAGIC had in effect Claims-Made Products/Completed Operations Liability

Insurance Policy No. MMO-24289LP201 ("the Policy") affording liability coverage to Phoenix

5

and other named insureds.[5]   The Policy provides coverage to its insureds for "those sums that the

insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property

damage' included within the 'products-completed operations hazard' to which the insurance

applies." [Doc. No. 46, Exh. A, p. 5].  The "'bodily injury' or 'property damage' must be caused

by an 'occurrence.'" [Doc. No. 46, Exh. A, p. 5].  "'Occurrence'" is defined as "an accident,

including continuous or repeated exposure to substantially the same general harmful conditions."

[Doc. No. 46, Exh. A, p. 19].

CCA was not a named insured under the Policy and thus cannot seek a defense or

indemnification on this basis.[6]   The Policy also contained a vendor's endorsement (Endorsement

#5), and the parties dispute whether this endorsement extends coverage to CCA as additional

insured.[7]   The vendor's endorsement provides as follows:

ENDORSEMENT #5

ADDITIONAL ASSURED [sic] - VENDORS

---

[5]The Policy provides that, "[i]n consideration of the payment of the premium in reliance upon the statements in the application on file with [NYMAGIC] and subject to all the terms of this [P]olicy, [NYMAGIC] agrees to cover the insured(s) named herein." [Doc. No. 46, Exh. A, p. 1].  The Policy specifically lists Phoenix and the following entities as "named insured[s]": Evergood Products Corporation; Robin Pharmacal Corporation; Nature House Products Corporation; Phoenix Laboratories International, Ltd.; EVSUB- A California Corporation; Great Earth Distributors, Inc.; Stress Buster Inc.; Dumo Laboratories Inc.; Phoenix Assets Corporation; Phoenix Holding Corporation; Bodyonics, Ltd.; Virtual Muscle Research Network, Inc; Great Earth Companies, Inc.; and Great Earth International Franchising Corp. [Doc. No. 46, Exh. A, p. 25].  CCA is not listed.

[6]Contrary to NYMAGIC's argument, the Court cannot dismiss CCA's claim on this basis alone, but must look to the entire Policy, including the vendor's endorsement.

[7]In Endorsement #9, NYMAGIC amended "the definition of insured" to include certain designated vendors, but CCA was not listed here and cannot claim coverage on this basis either. [Doc. No. 46, Exh. A, p. 40].

6

(BROAD FORM - BLANKET BASIS)

      In consideration of the premium charged, it is hereby agreed that the definition of insured is amended to include any person or organization designated as a vendor **but only with respect to the distribution or sale in the regular course of the vendor's business of the Named Insured's products** subject to the following additional provisions:

1.     The insurance with respect to the vendor does **not** apply to:

      (a)     any express warranty unauthorized by the named insured;

      (b)     bodily injury or property damage arising out of:

      . . .

          (iv)     products which after distribution or sale by the named insured have been labeled or relabeled or used as a container, part or ingredient of any other thing or substance by or for the vendor.

2.     The insurance does not apply to any person or organization, as insured, from whom the named insured has acquired such products or any ingredient, part or container, entering into, accompanying or containing such products.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

[Doc. No. 46, Exh. A, p. 36] (emphasis added).

      "Vendor's endorsements have been interpreted as providing coverage where the vendor is found strictly liable for selling a defective product and excluding coverage where the vendor is found to be independently negligent." McGill v. Cochran-Sysco Foods, 818 So.2d 301, 308 (La. App. 2 Cir. 5/8/02) (citing Hulsey v. Sears, Roebuck and Co., 96-2704 (La. App. 1 Cir. 12/29/97), 705 So.2d 1173; Easton v. Chevron Industries, Inc., 602 So.2d 1032 (La. App. 4 Cir. 1992), writs denied, 604 So.2d 1315 and 604 So.2d 1318 (La. 1992); see also Hartford Fire Ins. Co. v. St. Paul Surplus Lines Ins. Co., 280 F.3d 744, 745 (7th Cir. 2002) ("A manufacturer will

7

often add to its products liability insurance an endorsement extending coverage to distributors of its product who may be sued for breach of warranty or for strict products liability should the product turn out to be defective or unreasonably dangerous and cause an injury.").

NYMAGIC argues that CCA is not an insured and is precluded from asserting coverage in this lawsuit because "CCA's actions with regard to the production, labeling and marketing of Permathene render the vendor's endorsement inapplicable and/or fall squarely into the exclusions of the vendor's endorsement." [Doc. No. 42, p. 3].

CCA responds that the vendor's endorsement is "broad-based," that the plain language of the endorsement does not exclude coverage, that it was provided with Certificates of Liability Insurance during the relevant time period, and that NYMAGIC has a duty to defend it in this matter.

It is undisputed that CCA was a "vendor" engaged in the "distribution or sale in the regular course of the vendor's business of [Phoenix's] products." [Doc. No. 46, Exh. A., p. 36]. However, the Policy provides coverage "only **with respect to distribution or sale**" of Phoenix's products. This limitation is consistent with the prevailing view that vendor's endorsements are meant to provide coverage for a vendor who is strictly liable for the sale of a manufacturer's product, not where the vendor is alleged to have committed independent negligence or is otherwise independently liable to a plaintiff.

In this case, Weaver asserts claims against CCA[8] of defective design, defective manufacture, failure to warn, failure to adequately and properly test Permathene, and the failure of Permathene to conform to the express warranty issued by CCA. It is undisputed in this case

---

[8]Weaver has sued only CCA, not Phoenix.

8

that CCA provided the formula to Phoenix to manufacture Permathene (i.e. CCA told Phoenix to use PPA), CCA labeled Permathene after receiving it from Phoenix, and CCA conducted its own testing. CCA further admits that it had no authorization from Phoenix to issue a warranty, although CCA denies that it issued any warranty at all. There are no allegations that Phoenix had any independent liability regarding the design, manufacture, testing, or labeling of Permathene, much less that it manufactured a defective product which CCA innocently sold or distributed. See McGill v. Cochran Sysco Foods, 29,154 (La. App. 2 Cir. 2/26/97),  690 So.2d 952, 955-56 ("The critical fact is that Sysco [the vendor] delivered the allegedly defective product to the hospital and **could be an innocent link** in the chain of distribution of a defective product. The injury to Ms. McGill and the subsequent lawsuit against Sysco and Jet Spray [the manufacturer] are the very risks that Jet Spray sought to avoid by purchasing insurance. A reading of the complete U.S. Fire insurance contract reveals that the intent of the parties was to provide coverage to parties that **innocently distribute** a defective product.") (emphasis added).

Under these circumstances, the Court finds that CCA is not an additional insured of NYMAGIC. CCA was an "organization" engaged in "the distribution or sale in the regular course of . . . business of [Phoenix's] product[]," Permathene, but the claims against it were not made "solely with respect to" CCA's distribution or sale.

     **C.**    **Do CCA's Actions Render the Vendor's Endorsement Inapplicable?**

Alternatively, even if the Court found that CCA was an additional insured, the Court finds that the exclusions cited by NYMAGIC prevent CCA from obtaining coverage in this matter.[9]

---

     [9]CCA characterizes the "additional provisions" of the vendor's endorsement as exclusions from coverage, see [Doc. No. 46, p. 5], while NYMAGIC characterizes the additional provisions either as part of the definition of insured or as exclusions. Although the Policy uses

The Policy's vendor's endorsement plainly provides that a vendor's coverage for claims made "with respect to the distribution or sale" of Phoenix's products is "subject to [the endorsement's] additional provisions." [Doc. No. 46, Exh. A, p. 36]. Phoenix argues that CCA is not entitled to coverage under three provisions.

### 1. Express Warranty

First, NYMAGIC argues that the vendor's endorsement clearly excludes CCA from coverage because it extended an unauthorized warranty to the public.

CCA admits that it was not authorized by Phoenix or NYMAGIC to extend a warranty, but argues that the exclusion is inapplicable because CCA "made no express warranty to . . . Weaver at all." [Doc. No. 46, p. 7]. In essence, CCA contends that it is entitled to coverage because Weaver's warranty claim is without merit.

The issue is not the merit of Weaver's claim, but whether the Policy provides coverage and whether NYMAGIC has a duty to defend CCA against an express warranty claim. On its face, the Policy "does not apply to . . . any express warranty unauthorized by [Phoenix]." [Doc. No. 46, p.36]. CCA concedes that it did not have authority to provide a warrant to Weaver. CCA also concedes that it labeled the Permathene. Therefore, the only possible express warranty would have been extended on a label placed on the product by CCA without Phoenix's involvement.[10] Even if CCA is otherwise a covered "vendor" under the Policy, NYMAGIC is

the word "provisions," as opposed to "exclusions," it appears to the Court that, under Louisiana law, these would be treated as exclusions from coverage. See McGill, 818 So.2d at 307 (First defining the additional insured under the vendor's endorsement and then listing additional exclusions from coverage similar to those in this case).

[10]There is no allegation or information to suggest that a warranty was extended through any other method or means.

10

entitled to summary judgment on CCA's claim for coverage and indemnification by NYMAGIC
as to any express warranty claim by Weaver.

### 2.    Labeling Exclusion

NYMAGIC also relies on the exclusion from coverage for claims of bodily injury or
property damage when the product at issue has been labeled or relabeled after leaving the
manufacturer.  In this case, it is undisputed that Phoenix shipped the product at issue in bulk to
CCA, which then placed a label on the product.

CCA argues that it did nothing more than label the product "what it was, Permathene, a
diet nutritional supplement." [Doc. No. 46, p. 8].  CCA contends that, because it did not "change
the product itself or use it as a part of some other product," this exclusion does not apply. [Doc.
No. 46, p. 8].

The Court disagrees.  Coverage is excluded for bodily injury or property damage arising
from "products which after distribution or sale by the named insured have been labeled or
relabeled or used as a container, part or ingredient of any other thing or substance by or for the
vendor." [Doc. No. 46, Exh. A, p. 36].  Once Phoenix's product was distributed to CCA, any one
of three potential actions "by or for" CCA results in exclusion from coverage: (1) labeling the
product, (2) relabeling the product, or (3) use of the product "as a container part or ingredient of
any other thing or substance."  Phoenix provided Permathene to CCA, which then labeled the
product for sale to the general public.  Accordingly, the exclusion applies, and CCA is not
entitled to coverage for any claims, including failure to warn, stemming from its labeling.

### 3.    Provision of Ingredient Exclusion

Finally, NYMAGIC relies on a third exclusion from coverage for a vendor which

11

provides an "ingredient" to the insured manufacturer. It is undisputed that CCA provided
Phoenix with the formula used to manufacture Permathene. The dispute between the parties
centers on whether a formula is considered an ingredient, thus resulting in exclusion of coverage.

NYMAGIC cites a Minnesota federal district case in which that court found a formula is
an ingredient and thus precludes coverage under a vendor's endorsement. See Durabla Mfg. Co.
v. Continental Cas. Co., No. 98-1596 (RLE), 2000 WL 1996319 (D. Minn. June 9, 2000)

CCA, on the other hand, cites the dictionary definition of formula as a "recipe," which, in
turn, is defined as "a set of instructions for making something from various ingredients." [Doc.
No. 46, p. 9 (citing Merriam-Webster On-Line Dictionary, http://www.m-
w.com/dictionary/formula & http://www.m-w.com/dictionary/recipe)]. CCA argues that, under
Louisiana Civil Code article 2047, the Court must give the words of a contract their "generally
prevailing meaning," and the plain meaning of ingredient does not exclude a vendor which
provides a formula.

The Court agrees with the Durabla court that a formula may be the "ingredient" provided
to a manufacturer, which triggers this exclusion.

In the Durabla case, the district court was faced with determining whether a formula is an
"ingredient" or "part" of the asbestos sheet packing that the manufacturer, Goodyear, prepared
for Durabla's use. 2000 WL 1196319 at *9. The district court concluded that a formula
"plainly" is an ingredient or part of the product being manufactured under the following analysis,
which this Court adopts:

> The raw materials, which form the chemical elements of asbestos sheet packing,
> would not coalesce to form the end product, with the useful characteristics
> intended, unless those elements and materials were combined in a chemically and
> physically controlled fashion. The formula assures that the end product exhibits

12

the desired characteristics, and ensures a consistency in those characteristics to the consuming public. Simply put, the formula is the ingredient which integrates the other ingredients into a desirable product. The formula is as intrinsic to the end product as any of the product's other ingredients, when combined in compliance with that formula. Logically, and physically, the formula is an inherent ingredient in the end product. Accordingly, if . . . Durabla furnished a "secret" formula to Goodyear, then Durabla would not be a "person or organization" to whom vendor insurance coverage would apply. Durabla would not be an "insured."

Id.[11]

Likewise, the formula undisputedly provided by CCA to Phoenix was as much a part or ingredient of Permathene as any raw material. Accordingly, the Court finds that CCA is not entitled to coverage for claims based upon its provision to Phoenix of the formula for Permathene.

## III.    Conclusion

For the reasons set forth above, the Court finds that CCA is not an additional insured under the vendor's endorsement to the Policy issued to Phoenix. In the alternative, even if CCA is an additional insured, coverage is excluded in this matter. Accordingly, NYMAGIC's Motion for Summary Judgment is GRANTED. CCA's third-party claim against NYMAGIC for declaration of coverage and for indemnity is DENIED, and CCA's claims against NYMAGIC are DISMISSED WITH PREJUDICE.

MONROE, LOUISIANA, this __22__ day of __May__, 2007.

ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE

_____

[11]Although the Durabla court treated the exclusions in the policy before it as a "refine[ment] to the definition of insured," the court also indicated the distinction between the two made "no particular substantive difference" to its decision. Id.

13